# IN THE 16ᵗʰ CIRCUIT COURT OF JACKSON COUNTY, MISSOURI

| | |
|---|---|
| William Anthony Alexander<br>Deborah Marie Alexander | ) |
| | ) |
| | ) |
| PLAINTIFFS | ) Case No. _____ |
| V | ) |
| Hudson City Bancorp, Inc. | ) |
| Hudson City Savings Bank | ) |
| | ) |
| Wells Fargo N.A. dba Wells Fargo Home Mortgage Company Inc. | ) |
| Dba America's Servicing Corporation, a fictitious name owned by | ) |
| Norwest Mortgage, Inc. | ) Division _____ |
| | ) |
| Taylor, Bean & Whitaker Mortgage Corporation | ) |
| | ) |
| Kozeny & McCubbin | ) |
| | ) |
| The residence at 3003 Crystal Aire Court, | ) |
| Grain Valley, MO 64029 | ) |
| Legal Description LOT 20, CRYSTAL AIRE 3ᴿᴰ PLAT, A SUBDIVISION IN GRAIN | ) |
| VALLEY, JACKSON COUNTY, MISSOURI | ) |
| | ) |
| DEFENDANTS | ) |

2013 NOV 15 PM 1:43 FILED

## PETITION FOR JUDGMENT OF QUIET TITLE, WRONGFUL FORECLOSURE, AND DAMAGES FOR BREACH OF FIDUCIARY DUTY

COMES NOW the Plaintiffs and, for their Petition seeking a Judgment Quieting Title, a Judgment Voiding Purported Foreclosure, and Damages for Breach of Fiduciary Duty, states to the Court as follows:

## ALLEGATIONS COMMON TO ALL COUNTS

1. Plaintiffs state that this Circuit Court is the proper venue for this action. The subject property is located in Jackson County, Missouri. Subject matter jurisdiction is governed by the Missouri Constitution which grants circuit courts "...original jurisdiction over *all* cases and matters, civil and criminal." Mo. Const. Article V, Sec.14. This case is a civil case, therefore this Court has subject matter jurisdiction over this case. *Webb v Wyciskalla*, 275 S.W.3d, 253-254 (Mo. En banc 2009). Federal Court is not the proper venue, for any reason. Federal courts have an independent obligation to evaluate their jurisdiction. "If the court determines at any time that it lacks subject-matter jurisdiction,

APTCC 95

the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Any Party seeking removal bears the burden of proving subject matter jurisdiction. In re Business Men's Assur. Co. of America, 992 F .2d 181, 182 (8th Cir. 1993) Federal district courts are "required to resolve all doubts about federal jurisdiction in favor of remand." Id.

In the light of using fraudulent joinder as a means of removal, it is defined as "the filing of a frivolous or otherwise illegitimate claim against a non-diverse defendant solely to prevent removal." Filla v. Norfolk Southern Ry. Col, 336 F.3d 806,809 (8th Cir. 2003). In analyzing fraudulent joinder, "the district court's task is limited to determining whether there is arguably a reasonable basis for predicting that the state law might impose liability based on the facts involved." Id. at 811. So long as there is at least a "colorable" state law cause of action against the diversity-defeating defendant, joinder is not fraudulent. Id. at 810. In questionable areas of state law, "the better practice is for the federal court not to decide the doubtful question, but simply to remand the case and leave the question for the state courts to decide." Id. at 811 (quoting Iowa Public Ser. Co. v Medicine Bow Coal Co., 556 F .2d 400,406 ( 8th Cir. 1977).

This suit has been filed in state court. State court is the proper venue. The suit concerns a subject property located within this County and within the State of Missouri. Application of state law is primarily the responsibility of state courts. State court has jurisdiction.

2. That Defendant Hudson City Savings Bank, hereinafter "Hudson Savings", ordered Successor Trustee Kozeny & McCubbin, to initiate a foreclosure sale of the property commonly identified as 3003 Crystal Aire Court Grain Valley, MO 64029.

3. That such scheduling of an alleged sale date by Hudson City Savings Bank was, to the best of Plaintiff's knowledge, conducted in an attempt to enforce an alleged promissory note supposedly executed by Plaintiff to Taylor, Bean & Whitaker in 2006.
   Plaintiffs contend, purely for the sake of argument, that were any note purported to be held by Hudson City Savings Bank held to be otherwise legitimate, said note would be unenforceable for other reasons, including, but not necessarily limited to, the following:

   a. That Hudson City was not, at the time of the alleged scheduling of the foreclosure, the party entitled to enforce the alleged note. **(See Exhibit A-RSMo. 400-003.302 Holder in Due Course)**

b. That any such alleged note was transferred electronically without complying with the Uniform Electronic Transfers Act as adopted by the State of Missouri.

c. That any such alleged one and only true note was an offer to borrow by the Plaintiffs to Taylor, Beane & Whitaker and that no consideration was ever provided to the Plaintiffs by Taylor, Beane & Whitaker, or any other Party named herein or by any party identified in the alleged assignments. **(See Exhibit D- RSMo 400-003.303)**

4. That any Deed of Trust alleged to be associated with the purported note is also invalid for reasons including, but not necessarily limited to, the following:

a. That any such alleged note was transferred electronically without complying with the Uniform Electronic Transfers Act as adopted by the State of Missouri.

b. That any alleged note or deed of trust, whether valid or not, has, at various times been bifurcated or split.

<u>**COUNT 1**</u>
<u>**QUIET TITLE**</u>

COMES NOW the Plaintiffs and, for their Petition for an Order of this Court Quieting Title to the subject property in this matter and granting title in fee simple to them, their heirs, or assigns, states to the Court as follows:

1. That Plaintiffs incorporates the allegations contained in the section headed Allegations Common to All Counts as though fully set forth herein.

2. That any claim to title of the subject property by any Defendant named herein is derived from title held previously by Plaintiffs and purported by that Defendant to have been passed to them, directly or indirectly, from the Plaintiffs.

3. That any purported note related to the property or title in question has been altered and is not original and/or authentic and/or has been transferred by an individual or entity not authorized to do so and cannot be enforced. **(See Exhibit G RSMo 400-303.404 Imposters—fictitious payees)**

4. That no Defendant herein has now, or at any time, had any valid claim to title of the property.

WHEREFORE, Plaintiffs pray this Court enter its Order directing that a Deed in Fee Simple to the Plaintiffs be entered into the records of Jackson County, Missouri and that any record purporting to show title vested in any other individual or entity as of March 25, 2005 or subsequent, be stricken from those property records and held as void and for such other relief as the Court deems appropriate.


## COUNT II

### CONVERSION OF A NEGOTIABLE INSTRUMENT
### UNJUST ENRICHMENT
### INCLUDING PUNITIVE DAMAGES


COMES NOW, the Plaintiffs and, for their Petition for Wrongful Foreclosure against Defendant Hudson City Savings Bank and Wells Fargo Home Mortgage CAmerican Servicing Company states to the Court as follows:

1. That Plaintiffs hereby incorporate all of the allegations contained in the section headed Allegations Common to All Counts as though fully set forth herein.

2. That this Count pertains to Defendant Hudson City Savings Bank and American Servicing Company.

3. That Hudson City Savings ordered what it purported to be a foreclosure sale date of the property. Yet, Hudson City Bank, nor any of its agents, when asked in writing to present the Promissory Note for exhibit, did not do so, and still has not. In order to foreclose, even in a non-judicial jurisdiction, there must be legal possession and Presentment of the Promissory Note belonging to the Issuer, or obligor, in this case Plaintiffs. **(Exhibit C RSMo. 400.3.501 Presentment)**.

4. That Hudson City Savings Mortgage was attempting to purchase the property at its own foreclosure sale and may still try to accomplish this, even though Hudson City has never proven it's Standing in this matter, and yet continues to try to collect on a Promissory Note it does not have. **(RSMo. 400.3.404 Imposter/Fictitious Payee.)**

5. That Hudson City Savings intended to purchase the subject property using a non-existent credit bid.

6. That Hudson City Savings does not pay cash or any cash equivalent for such purchases of the alleged debt and cannot show that it does with copies of wire

transfers or other cash equivalents. **(Exhibit D RSMo. 400.3-303 Value and Consideration)**

7. That Hudson City Savings Bank and American Servicing Company has collected on default claims against mortgage insurance policies placed on this alleged subject loan from mortgage insurers without applying these payments to Plaintiffs' loan balance and without notifying Plaintiffs of these claims funds.

8. That only the owner/holder of a valid note is entitled to make a purchase at a purported foreclosure sale with a credit bid.

9. That, at the time of the purported scheduling of the foreclosure sale date Hudson did not hold title to what Hudson has represented to Plaintiffs was the note. Hudson City Savings has had multiple servicers collect loan payment monies from Plaintiffs, and mortgage insurance claims payouts, based on a false claim of ownership and therefore knowingly or unknowingly is guilty of Conversion of a negotiable instrument.

10. That only the party with the right to enforce the note has the right to foreclose.

11. That the purported foreclosure rights by Hudson City Savings should be declared, invalid and void unless and until they have provided the documents determining the ownership requirements according to **(Exhibit C RSMo. 400.3-501 Presentment).**

12. Hudson City Savings has failed and may be in bankruptcy court, therefore Plaintiffs do not know who the attorneys purporting to represent Hudson City Savings are actually representing. This information must be given to Plaintiffs, or how do Plaintiffs know who to address in this lawsuit. **(RSMo. 432.010 Statute of Frauds).**

13. That, as the party in possession of the multiple copies of purported notes related to this matter, Kozeny McCubbin and Hudson City Savings knew or should have known there was no authentic paperwork, or they should have presented authentic documents.

14. That Plaintiffs could be severely damaged by Hudson City Savings and its attempt at wrongful foreclosure using its agent Kozeny & McCubbin.

15. That Plaintiffs, have since the alleged scheduled Wrongful Foreclosure, believed that these Defendants may be scheduling another attempt at Wrongful Foreclosure and Unlawful Eviction.

WHEREFORE, Plaintiffs pray this Court for its Order Canceling any Purported Note Under Which Hudson City Savings have attempted Wrongfully Foreclosing and

Declaring any Related Deed of Trust Void and for an Order Setting Aside any Judgment in Unlawful Detainer Court and Damages in the future taken against Plaintiffs and Ordering the same Held for Naught as well as for any other relief as the Court deems proper.

## COUNT III
## BREACH OF FIDUCIARY DUTY

COMES NOW the Plaintiffs and, for his claim of Breach of Fiduciary Duty against Defendant Kozeny & McCubbin, state to the Court as follows:

1. That Plaintiffs incorporate the allegations contained in the section headed Allegations Common to all Counts as though fully set forth herein.

2. That this Count pertains solely to Defendant Kozeny & McCubbin.

3. That Kozeny & McCubbin acted as Successor Trustee in the purported scheduling of a foreclosure sale referred to above. All correspondence referred to foreclosure against an alleged Deed of Trust, but no mention of the alleged instrument representing debt. This foreclosure was being set up against a Deed of Trust only. Without a genuine Promissory Note and a Deed of Trust and both in the same legal name there is created a Bifurcation of the Note and Security instrument, or splitting of the documents. **(Exhibit E Case U.S. Supreme Court Carpenter v. Longan, 83 U.S. 16 Wall. 271 271 (1872) APPEAL FROM THE SUPREME COURT OF COLORADO TERRITORY)**

   a. That even the most minimal inspection of the foreclosing documents, which consisted of mainly a fraudulent Deed of Trust, would have uncovered these conflicting alleged documents of the loan file. How, can it be explained that specialist attorneys did not notice.

   See **(Exhibit J),** these are documents sent to Plaintiffs by America's Servicing Company on behalf of Wells Fargo in response to Plaintiffs' written request for authentic proof of who they were supposed to pay. These documents are copies from an alleged closing of the Promissory Note and Deed of Trust that defendants are using as their exclusive proof of the authenticity of their fraudulent claims. Note that the replica from closing of the Promissory Note makes no mention of MERS. The Deed of Trust however endows MERS as sole nominee, and as beneficiary under the "Deed of Trust" on page one. MERS has Powers given to them by Taylor, Bean and Whitaker and allegedly by the Borrower on one document, but not on the other. These two documents have different terms, which creates a nullity of both. At the top of the Deed of Trust there is an eighteen digit MIN number. MIN stands for MERS identification number and indicates that the arrangement for securitizing this

loan had been arranged before any alleged Borrower stepped into the closing room. The Promissory Note has no such number. This is why defendants constantly claim their rights under the deed of trust, and always have a copy ready to hand out. This is also why Defendants never plead that they are owed money, nor do defendants ever claims injury due to losing use of their money. There was never any money provided by these Defendants here. This is why the robo signers of 2010 were counterfeiting and forging assignments. They were trying to rebuild a chain of title at the courthouse to enable them to claim a lost Promissory Note, when they had actually split the documents themselves intentionally

4. That Kozen & McCubbin has scheduled a foreclosure sale of the property at the order of Defendant Hudson Savings.

5. That Kozeny & McCubbin intended to sell the property at such purported foreclosure sale to Hudson City Savings and may yet do it.

6. That Kozeny & McCubbin were to conduct such sale to Hudson City Saving using a non-existent credit bid from Hudson City Savings and not for cash or any cash equivalent.

7. That Kozeny & McCubbin had a duty to conduct a sale that was fair and impartial to both the alleged foreclosing party as well as the party being foreclosed upon.

8. That Kozeny & McCubbin failed to ascertain that Hudson City Savings was, in fact, the party entitled to enforce any note. This is clearly evident considering the purported note copies, which were from the alleged original closing and not authentic, provided to Plaintiffs after Plaintiffs' written request for physical proof of ownership as required in (**RSMo 400.3-501 Presentment**). The Correspondence to Plaintiffs clearly show that, even if the alleged note were to be valid, the party holding title to it was not Hudson City Savings. MERS was named on the alleged Security Instrument as a "beneficiary" of unknown agency, but never mentioned on the alleged Promissory Note. This constitutes an intentional bifurcation, or splitting of the Note from the Security Instrument. These two documents had very different terms creating a nullity of both documents.

9. That trying to conduct a foreclosure sale without making even the minimal determination of whether the party attempting to foreclose has the right to enforce the note can hardly be "fair" and "impartial" to the party whose property is being taken.

10. That Kozeny & McCubbin acted in conscious disregard of Plaintiffs' rights and that Plaintiffs were damaged thereby and should be awarded nominal

actual damages as well as punitive damages sufficient to deter Kozeny & Mcubbin and any others likewise situated from such conduct in the future.

WHEREFORE, Plaintiffs pray this Court enter its Judgment against Defendant Kozeny & McCubbin for Breach of Fiduciary Duty and awarding Plaintiffs nominal actual damages as well as punitive damages in an amount sufficient to deter Kozeny & McCubbin and others similarly situated from such conduct in the future as well as for such other relief as the Court deems just.

## COUNT IV

## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT

COMES NOW the Plaintiffs and, for their claim of violations of the Missouri Merchandising Practices Act against Defendants Hudson City Savings Bank, hereinafter "Hudson", Kozeny and McCubbin, hereinafter "Kozeny", Taylor, Bean & Whitaker, hereinafter TBW, and "Wells Fargo N. A. dba Wells Fargo Home Mortgage, Inc. dba America's Servicing Corporation an expired fictitious name owned by administratively dissolved Norwest Mortgage, Inc. owned by administratively dissolved Wells Fargo Home Mortgage, Inc." hereinafter "Wells as ASC" and state to the Court:

1. That Plaintiffs incorporate the allegations contained in the section headed Allegations Common to all Counts as though fully set forth herein.

2. That Defendants working in concert created the illusion that an alleged loan contract which named TBW as lender, had actually been funded by TBW. Written requests for proof showing authentic documents from this transaction including copies of funding wires, cash, or other equivalent payment coming from TBW to fund any alleged closing regarding Plaintiffs have gone unanswered by all Defendants. Defendants were led to believe that their loan was owned by America's Servicing Company. They were billed by this company and paid this company for years. But, to demonstrate how far these defendants would go to deceive, misrepresent, conceal, suppress, suppress and omit material facts and use fraudulent documents to set up the stealing of a house using elaborate deceptive and fraudulent misrepresentation of contracts, please note that the name of one defendant is "Wells Fargo National Association d/b/a/ Wells Fargo Home Mortgage Company Inc. d/b/a America's Servicing Corporation, a fictitious name owned by Norwest Mortgage Company d/b/a as Wells Fargo Home Mortgage Company". These names were all registered with the Secretary of State of

Missouri, but all these names no longer have any right to do business in Missouri, because each no longer maintains registration with the Secretary of State of Missouri. Wells as ASC has claimed the right to bill, collect money, disburse money to unknown actual Holders in Due Course and continuing doing so, even after failing to answer Plaintiffs written request for the information proving who all of these entities were and from where they derived their authority. This deception cannot be unintentional. The related companies wanted to keep secrets from Plaintiffs. **(See Exhibit H)**

3. Defendants have employed deceptive practices rising to fraud, false pretense, false promises regarding a contract, misrepresentation, and the concealment, suppression and omission of material facts to use non-existent allegedly duly perfected contractual documents in an attempt to take Plaintiffs' home using a fraudulent Missouri non-judicial foreclosure sale while representing to Plaintiffs and the court that one of the Defendants, Hudson was a Holder in Due Course of a certain alleged Promissory Note. Defendants all claim that Hudson became so by purchasing the note legally with funds intended for that purpose. No such original legal document has been proffered. **(RSMo. 432.010 Statute of Frauds-Contracts must be in writing), (RSMo. 400.3-501 Presentment), (RSMo. 400.3-404 Imposter/Fictitious Payee).**

3. That the alleged 2012 assignment by Mortgage Electronic Registration Systems Inc., as Grantor, while acting as an alleged agent, or "nominee" for TBW of the alleged 2005 loan can never have happened. This is because TBW in 2005 was an originator or broker of home loans. In this capacity TBW took fees in compensation for introducing Borrowers and Lenders to each other, and never funding any loans with its own money. This is in contrast to its being the named Lender on the loan documents. **(RSMo. 400.3-303 Value and Consideration)**. The Power of attorney or agency agreement between MERS and TBW was being used to assign an alleged loan 7 years after the closing, and four years after the rather spectacular failure of TBW after criminal indictments for fraud. MERS has repeatedly stated in public and on its website that it did not own or have equity in any loans at any time. This "nominee" contract has never been presented to Plaintiff for inspection even though Plaintiff has requested this in writing and will again in Discovery.

4. That even if Hudson could come up with some sort of document to present to the court, the alleged assignment of the alleged document to them, The fact that the Security Instrument allegedly gives MERS the power to assign the Deed of Trust, MERS is not given this power in Promissory Note. This is considered a

bifurcation, or splitting of the two documents and cannot be accomplished as per **(Exhibit H RSMO 400.3 NEGOTIABLE INSTRUMENTS)**. The presentation that this assignment happened is misrepresentation and fraud by definition. A quick reading of the two documents will show this, if in fact, both authentic alleged documents can be found. **(RSMo. 432.010 Contracts to be in writing). (Case U.S. Supreme Court Carpenter v. Longan, 83 U.S. 16 Wall. 271 271 (1872) APPEAL FROM THE SUPREME COURT OF COLORADO TERRITORY)**

5. Defendants and others contrived these illegal and impossible transactions to wrongfully set a foreclose sale date of 06/21/2013 for Plaintiff's home by Hudson. This sale did not happen, but the threat of it has not been extinguished and this fact creates constant and unbearable anxiety for Plaintiffs.

WHEREFORE, Plaintiffs pray this Court enter its Judgment against Defendants Hudson City Savings Bank, Taylor, Bean & Whitaker, hereinafter TBW, and Wells Fargo N. A. dba America's Servicing Corporation, and Kozeny and McCubbin, the Foreclosure Trustee, for violations of the Missouri Merchandising Practices Act, and awarding Plaintiffs nominal actual damages as well as punitive damages in an amount sufficient to deter Defendants and others similarly situated from such conduct in the future as well as for such other relief as the Court deems just.

Respectfully Submitted,

William Alexander  Pro Se          Debbie Alexander Pro Se

# Exhibit A

# *Missouri Revised Statutes*

## Chapter 400
## Uniform Commercial Code
## Section *400-003.302*

August 28, 2013

**Holder in due course.**

400.3-302. (a) Subject to subsection (c) and Section 400.3-106(d), "holder in due course" means the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 400.3-306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 400.3-305(a).

(b) Notice of discharge of a party, other than discharge in an insolvency proceeding, is not notice of a defense under subsection (a), but discharge is effective against a person who became a holder in due course with notice of the discharge. Public filing or recording of a document does not of itself constitute notice of a defense, claim in recoupment, or claim to the instrument.

(c) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken (i) by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding, (ii) by purchase as part of a bulk transaction not in ordinary course of business of the transferor, or (iii) as the successor in interest to an estate or other organization.

(d) If, under Section 400.3-303(a)(1), the promise of performance that is the consideration for an instrument has been partially performed, the holder may assert rights as a holder in due course of the instrument only to the fraction of the amount payable under the instrument equal to the value of the partial performance divided by the value of the promised performance.

(e) If (i) the person entitled to enforce an instrument has only a security interest in the instrument and (ii) the person obliged to pay the instrument has a defense, claim in recoupment, or claim to the instrument that may be asserted against the person who granted the security interest, the person entitled to enforce the instrument may assert rights as a holder in due course only to an amount payable under the instrument which, at the time of enforcement of the instrument, does not exceed the amount of the unpaid obligation secured.

(f) To be effective, notice must be received at a time and in a manner that gives a reasonable opportunity to act on it.

(g) This section is subject to any law limiting status as a holder in due course in particular classes of transactions.

(L. 1963 p. 503 § 3-302, A.L. 1992 S.B. 448)

---

© Copyright

 Missouri General Assembly

# Exhibit B

eractices



**ELECTRONICALLY RECORDED**
JACKSON COUNTY, MISSOURI
**04/09/2012 12:26:10 PM**
ASDT    FEE: $ 24.00    2    Pages

INSTRUMENT NUMBER:
**2012E0037267**

Parcel Identifier No:
MERS ID: 10002950000074311137
MERS Telephone: 1-888-679-6377

### ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR TAYLOR, BEAN AND WHITAKER MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS** (herein "Grantor") whose address is **BOX 2026 FLINT MI 48501 1901 E VOORHEES ST STE C, DANVILLE, IL 61834**, does hereby grant, sell, assign, transfer and convey, unto **HUDSON CITY SAVINGS BANK** (herein "Grantee") whose address is **WEST 80 CENTURY ROAD , PARAMUS, NJ 07652**, a certain Mortgage dated **03/25/2005** and recorded **03/31/2005** made and executed by **WILLIAM ANTHONY ALEXANDER AND DEBORAH MARIE ALEXANDER**, to and in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR TAYLOR, BEAN AND WHITAKER MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS** upon the following described property. Such Mortgage having been given to secure payment of $242000.00 which Mortgage is of record in Book, Volume or Liber No. , at Page , as Document No. 2005I0026190 , of the Records of **Jackson** County, State of **MO** , together with the note(s) and obligations therein described and the money due and to become due thereon with interest, and all rights accrued or to accrue under such Mortgage

Legal Description: **LOT 20, CRYSTAL AIRE 3RD PLAT, A SUBDIVISION IN JACKSON COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF.**
TO HAVE AND TO HOLD the same unto Grantee, its successor and assigns, forever, subject only to the terms and conditions of the above described Mortgage.

IN WITNESS WHEREOF, the undersigned Grantor has executed this Assignment of Mortgage on **04/09/2012**
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR TAYLOR, BEAN AND WHITAKER MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS**

AZZA A. ZARROUG, Assistant Secretary

STATE OF MN
COUNTY OF Dakota } S.S.

On **04/09/2012** before me **MICHAEL J. MURPHY**, Notary Public, personally appeared **AZZA A. ZARROUG**, **Assistant Secretary** personally known to me for proved to me on the basis of satisfactory evidence), to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person or entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal

MICHAEL J. MURPHY
Commission # 31045582
My Commission Expires: **01/31/2016**
**Recording requested by:** WELLS FARGO BANK, N.A.



**Return To:** WELLS FARGO BANK, N.A. DEFAULT ASSIGNMENT MAC: X9999-018 PO BOX 1629, MINNEAPOLIS, MN 55440-9790

# Exhibit C

# *Missouri Revised Statutes*

## Chapter 400
## Uniform Commercial Code
## Section *400-003.501*

August 28, 2013

**Presentment.** 400.3-501. (a) "Presentment" means a demand made by or on behalf of a person entitled to enforce an instrument (i) to pay the instrument made to the drawee or a party obliged to pay the instrument or, in the case of a note or accepted draft payable at a bank, to the bank, or (ii) to accept a draft made to the drawee.

(b) The following rules are subject to Article 4, agreement of the parties, and clearing-house rules and the like:

(1) Presentment may be made at the place of payment of the instrument and must be made at the place of payment if the instrument is payable at a bank in the United States; may be made by any commercially reasonable means, including an oral, written, or electronic communication; is effective when the demand for payment or acceptance is received by the person to whom presentment is made; and is effective if made to any one of two or more makers, acceptors, drawees, or other payors.

(2) Upon demand of the person to whom presentment is made, the person making presentment must (i) exhibit the instrument, (ii) give reasonable identification and, if presentment is made on behalf of another person, reasonable evidence of authority to do so, and (iii) sign a receipt on the instrument for any payment made or surrender the instrument if full payment is made.

(3) Without dishonoring the instrument, the party to whom presentment is made may (i) return the instrument for lack of a necessary endorsement, or (ii) refuse payment or acceptance for failure of the presentment to comply with the terms of the instrument, an agreement of the parties, or other applicable law or rule.

(4) The party to whom presentment is made may treat presentment as occurring on the next business day after the day of presentment if the party to whom presentment is made has established a cut-off hour not earlier than 2 p.m. for the receipt and processing of instruments presented for payment or acceptance and presentment is made after the cut-off hour.

(L. 1992 S.B. 448)

*No continuity with § 400.3-501 as repealed by L. 1992 S.B. 448.

© Copyright

 Missouri General Assembly

# Exhibit D

# *Missouri Revised Statutes*

## Chapter 400
## Uniform Commercial Code
## Section *400-003.303*

August 28, 2013

**Value and consideration.**

400.3-303. (a) An instrument is issued or transferred for value if:

(1) the instrument is issued or transferred for a promise of performance, to the extent the promise has been performed;

(2) the transferee acquires a security interest or other lien in the instrument other than a lien obtained by judicial proceeding;

(3) the instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due;

(4) the instrument is issued or transferred in exchange for a negotiable instrument; or

(5) the instrument is issued or transferred in exchange for the incurring of an irrevocable obligation to a third party by the person taking the instrument.

(b) "Consideration" means any consideration sufficient to support a simple contract. The drawer or maker of an instrument has a defense if the instrument is issued without consideration. If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed. If an instrument is issued for value as stated in subsection (a), the instrument is also issued for consideration.

(L. 1963 p. 503 § 3-303, A.L. 1992 S.B. 448)

# Exhibit E

## Original Deed of Trust Alexander to Taylor, Bean& Whitaker Mortgage Corp 3/25/2005

1417 North Magnolia Ave

Ocala, Fl 34475

*Exhibit*
*E*

RECORDER'S CERTIFICATION
JACKSON COUNTY, MISSOURI
03/31/2005 11:11:51 AM
INSTRUMENT TYPE: DT   FEE: $66.00   18 Pages

INSTRUMENT NUMBER/BOOK & PAGE

2005I0026190

ROBERT T. KELLY, DIRECTOR OF RECORDS

——————————————— [Space Above This Line For Recording Data] ———————————————

(1)  Type of Document: DEED OF TRUST
(2)  Date of Document: **March 25, 2005**
(3)  Grantor/Borrower Names: **William Anthony Alexander, Deborah Marie Alexander**

(4)  Grantee/Lender Name and Address: **Taylor, Bean & Whitaker Mortgage Corp.**
     **1417 North Magnolia Ave**
     **Ocala, FL  34475**

(5)  Legal description or location of legal description in the document:
     **See Attached Exhibit A.**  Page  15

After Recording Return To:
ATI TITLE
1600 NW MOCK AVENUE
BLUE SPRINGS              , MO 64014


528485
**First American Title**
1600 NW Mock Avenue
Blue Springs, MO 64015
816-229-5960

MISSOURI RECORDING COVER SHEET

ITEM T9719L1 (0111)- MERS

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

*024082743113*

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **March 25, 2005**                    , together with all Riders to this document.

(B) **"Borrower"** is **William Anthony Alexander and Deborah Marie Alexander**

Borrower is the trustor under this Security Instrument.

(C) **"Lender"** is **Taylor, Bean & Whitaker Mortgage Corp.**
Lender is a **a Florida Corporation**                                                   organized and existing under
the laws of **FL**                                                                   . Lender's address is
**1417 North Magnolia Ave, Ocala, FL 34475**

(D) **"Trustee"** is ATI/ATILE   DAVID BYRN

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) **"Note"** means the promissory note signed by Borrower and dated **March 25, 2005**                    . The Note states that Borrower owes Lender **Four Hundred Twenty Thousand and no/100**
Dollars (U.S. **$420,000.00**                    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

MISSOURI—Single Family   Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM T9718L2 (0111)—MERS

*(Page 1 of 14 pages)*

Form 3026 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 ☐ Fax: 616-791-1131

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, bargains, sells, conveys and confirms to Trustee, in trust, with power of sale, the following described property located in the **County** of **Jackson** :

[Type of Recording Jurisdiction]    [Name of Recording Jurisdiction]

**See Attached Exhibit A.**    Page 15

which currently has the address of    **3003 Crystal Aire Court**
[Street]

**Grain Valley** , Missouri    **64029**    ("Property Address"):
[City]    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's

MISSOURI—Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3026 1/01

ITEM T9719L4 (0111)—MERS    (Page 3 of 14 pages)    GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Case 4:14-cv-00007-BCW    Document 1-2    Filed 01/03/14    Page 21 of 95

check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3026 1/01

ITEM T9718L5 (0711)—MERS

*(Page 4 of 14 pages)*

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3026 1/01

ITEM 7971RL8 (011:)—MERS                                    (Page 5 of 14 pages)                                    GREATLAND ®
                                                                                          To Order Call: 1-800-530-8838 ☐ Fax 615-791-1131

coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM T9719L7 (0811)—MERS

(Page 6 of 14 pages)

Form 3026 1/01

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause. Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3026 1/01

ITEM T9714L6 (0111)—MERS      *(Page 7 of 14 pages)*      GREATLAND ■
To Order Call: 1-800-530-9999 □ Fax: 616-791-1131

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or

Case 4:14-cv-00007-BCW   Document 1-2   Filed 01/03/14   Page 26 of 95

not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3026 1/01

ITEM 7972L10 (0111)  MFMO      *(Page 9 of 14 pages)*      GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3026 1/01

ITEM T9710L11 (0111)—MERS

*(Page 10 of 14 pages)*

GREATLAND ■
To Order Call: 1-800-530-8393 □ Fax: 616-791-1131

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the**

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3026 1/01

ITEM T97-3I 12 (0111b—MERS)

(Page 11 of 14 pages)

GREATLAND ■
To Order Call: 1-800-530-9399 □ Fax: 616-791-1131

action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall mail copies of a notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property to any later time on the same date by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Lease of the Property.** Trustee hereby leases the Property to Borrower until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Borrower, and every person claiming an interest in or possessing the Property or any part thereof, shall pay rent during the term of the lease in the amount of one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.

26. **Homestead Exemption.** Borrower hereby waives all homestead exemptions in the Property to which Borrowers would otherwise be entitled under Applicable Law.

27. **Notice.** Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3026 1/01

ITEM 1972L13 (0111)—MERS     (Page 12 of 14 pages)     GREATLAND ●
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 14 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
William Anthony Alexander            -Borrower

_____ (Seal)
Deborah Marie Alexander             -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

Witness:                            Witness:

_____    _____

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3026 1/01

ITEM T9719L14 (0411)—MERS          (Page 13 of 14 pages)          GREATLAND ■
                                                      To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

State of MO
County (and/or city) of Jackson

On this 25 day of March, 2005, before me personally appeared
William Anthony Alexander and Deborah Marie
Alexander husband and wife
to me known to be the person (or persons) described in and who executed the foregoing instrument, and acknowledged
that he/she/they executed the same as his/her/their free act and deed.

_Jen Brown_
Notary Public

JEN BROWN
Notary Public-Notary Seal
STATE OF MISSOURI
Jackson County
My Comm. Expires: OCT. 21, 2007

MISSOURI—Single Family   Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                Form 3026 1/01

GREATLAND ■
ITEM T6719L16 (0111)—MERS                        (Page 14 of 14 pages)         To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

# EXHIBIT 'A'

**LOT 20, CRYSTAL AIRE 3RD PLAT, A SUBDIVISION IN JACKSON COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF.**
**A.P.N.**

Initials: _____   _____          Page 1 of 1   15

# Exhibit F

## Carpenter v. Longan - 83 U.S. 271 (1872)

Syllabus

Case U.S. Supreme Court Carpenter v. Longan, 83 U.S. 16 Wall. 271 271 (1872)

APPEAL FROM THE SUPREME

COURT OF COLORADO TERRITORY

Syllabus

1. The assignment of a negotiable note before its maturity raises the presumption of a want of notice of any defense to it, and this presumption stands till it is overcome by sufficient proof.

2. When a mortgage given at the same time with the execution of a negotiable note and to secure payment of it, is subsequently, but before the maturity of the note, transferred bona fide for value, with the note, the holder of the note when obliged to resort to the mortgage is unaffected by any equities arising between the mortgagor and mortgagee subsequently to the transfer, and of which he, the assignee, had no notice at the time it was made. He takes the mortgage as he did the note.

MR. JUSTICE SWAYNE stated the case, and delivered the opinion of the Court.

On the 5th of March, 1867, the appellee, Mahala Longan, and Jesse B. Longan, executed their promissory note to Jacob B. Carpenter, or order, for the sum of $980, payable six months after date, at the Colorado National Bank, in Denver City, with interest at the rate of three and a half percent per month until paid. At the same time Mahala Longan executed to Carpenter a mortgage upon certain real estate

Page 83 U. S. 272

therein described. The mortgage was conditioned for the payment of the note at maturity, according to its effect.

On the 24th of July, 1867, more than two months before the maturity of the note, Jacob B.

Carpenter, for a valuable consideration, assigned the note and mortgage to B. Platte Carpenter, the appellant. The note not being paid at maturity, the appellant filed this bill against Mahala Longan, in the District Court of Jefferson County, Colorado territory, to foreclose the mortgage.

She answered and alleged that when she executed the mortgage to Jacob B. Carpenter, she also delivered to him certain wheat and flour, which he promised to sell, and to apply the proceeds to the payment of the note; that at the maturity of the note she had tendered the amount due upon it, and had demanded the return of the note and mortgage and of the wheat and flour, all which was refused. Subsequently she filed an amended answer, in which she charged that Jacob B. Carpenter had converted the wheat and flour to his own use, and that when the appellant took the assignment of the note and mortgage, he had full knowledge of the facts touching the delivery of the wheat and flour to his assignor. Testimony was taken upon both sides. It was proved that the wheat and flour were in the hands of Miller & Williams, warehousemen, in the City of Denver, that they sold, and received payment for, a part, and that the money thus received and the residue of the wheat and flour were lost by their failure. The only question made in the case was, upon whom this loss should fall, whether upon the appellant or the appellee. The view which we have taken of the case renders it unnecessary to advert more fully to the facts relating to the subject. The district court decreed in favor of the appellant for the full amount of the note and interest. The supreme court of the territory reversed the decree, holding that the value of the wheat and flour should be deducted. The complainant thereupon removed the case to this Court by appeal.

It is proved and not controverted that the note and mortgage were assigned to the appellant for a valuable consideration

Page 83 U. S. 273

before the maturity of the note. Notice of anything touching the wheat and flour is not brought home to him.

The assignment of a note underdue raises the presumption of the want of notice, and this presumption stands until it is overcome by sufficient proof. The case is a different one from what it would be if the mortgage stood alone, or the note was nonnegotiable, or had been assigned after maturity. The question presented for our determination is, whether an assignee, under the circumstances of this case, takes the mortgage as he takes the note, free from the objections to which it was liable in the hands of the mortgagee. We hold the affirmative. [Footnote 1] The contract as regards the note was that the maker should pay it at maturity to any bona fide endorsee, without reference to any defenses to which it might have been liable in the hands of the payee. The mortgage was conditioned to secure the fulfillment of that contract. To let in such a defense against such a holder would be a clear

departure from the agreement of the mortgagor and mortgagee, to which the assignee subsequently, in good faith, became a party. If the mortgagor desired to reserve such an advantage, he should have given a nonnegotiable instrument. If one of two innocent persons must suffer by a deceit, it is more consonant to reason that he who "puts trust and confidence in the deceiver should be a loser rather than a stranger." [Footnote 2]

Upon a bill of foreclosure filed by the assignee, an account must be taken to ascertain the amount due upon the instrument secured by the mortgage. Here the amount due was the face of the note and interest, and that could have been recovered in an action at law. Equity could not find that

Page 83 U. S. 274

less was due. It is a case in which equity must follow the law. A decree that the amount due shall be paid within a specified time, or that the mortgaged premises shall be sold, follows necessarily. Powell, cited supra, says:

"But if the debt were on a negotiable security, as a bill of exchange collaterally secured by a mortgage, and the mortgagee, after payment of part of it by the mortgagor, actually negotiated the note for the value, the endorsee or assignee would, it seems, in all events, be entitled to have his money from the mortgagor on liquidating the account, although he had paid it before, because the endorsee or assignee has a legal right to the note and a legal remedy at law, which a court of equity ought not to take from him, but to allow him the benefit of on the account."

A different doctrine would involve strange anomalies. The assignee might file his bill and the court dismiss it. He could then sue at law, recover judgment, and sell the mortgaged premises under execution. It is not pretended that equity would interpose against him. So if the aid of equity were properly invoked to give effect to the lien of the judgment upon the same premises for the full amount, it could not be refused. Surely such an excrescence ought not to be permitted to disfigure any system of enlightened jurisprudence. It is the policy of the law to avoid circuity of action, and parties ought not to be driven from one forum to obtain a remedy which cannot be denied in another.

The mortgaged premises are pledged as security for the debt. In proportion as a remedy is denied the contract is violated, and the rights of the assignee are set at naught. In other words, the mortgage ceases to be security for a part or the whole of the debt, its express provisions to the contrary notwithstanding.

The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. [Footnote 3]

It must be admitted that there is considerable discrepancy in the authorities upon the question under consideration.

In Baily v. Smith [Footnote 4] -- a case marked by great ability and fullness of research -- the Supreme Court of Ohio came to a conclusion different from that at which we have arrived. The judgment was put chiefly upon the ground that notes, negotiable, are made so by statute, while there is no such statutory provision as to mortgages, and that hence the assignee takes the latter as he would any other chose in action, subject to all the equities which subsisted against it while in the hands of the original holder. To this view of the subject there are several answers.

The transfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter. If not assignable at law, it is clearly so in equity. When the amount due on the note is ascertained in the foreclosure proceeding, equity recognizes it as conclusive, and decrees accordingly. Whether the title of the assignee is legal or equitable is immaterial. The result follows irrespective of that question. The process is only a mode of enforcing a lien.

All the authorities agree that the debt is the principal thing and the mortgage an accessory. Equity puts the principal and accessory upon a footing of equality, and gives to the assignee of the evidence of the debt the same rights in regard to both. There is no departure from any principle of law or equity in reaching this conclusion. There is no analogy between this case and one where a chose in action standing alone is sought to be enforced. The fallacy which lies in overlooking this distinction has misled many able minds, and is the source of all the confusion that exists. The mortgage can have no separate existence. When the note is paid the mortgage expires. It cannot survive for a moment the debt which the note represents. This dependent and incidental relation is the controlling consideration, and takes the case out of the rule applied to choses in action,

where no such relation of dependence exists. Accessorium non ducit, sequitur principale.

In Pierce v. Faunce, [Footnote 5] the court said:

"A mortgage is pro tanto a purchase, and a bona fide mortgagee is equally entitled to protection as the bona fide grantee. So the assignee of a mortgage is on the same footing with the bona fide mortgagee. In all cases the reliance of the purchaser is upon the record, and when that discloses an unimpeachable title he receives the protection of the law as against unknown and latent defects."

Matthews v. Wallwyn [Footnote 6] is usually much relied upon by those who maintain the infirmity of the assignee's title. In that case, the mortgage was given to secure the payment of a nonnegotiable bond. The mortgagee assigned the bond and mortgage fraudulently and thereafter received large sums which should have been credited upon the debt. The assignee sought to enforce the mortgage for the full amount specified in the bond. The Lord Chancellor was at first troubled by the consideration that the mortgage deed purported to convey the legal title, and seemed inclined to think that might take the case out of the rule of liability which would be applied to the bond if standing alone. He finally came to a different conclusion, holding the mortgage to be a mere security. He said, finally:

"The debt therefore is the principal thing, and it is obvious that if an action was brought on the bond in the name of the mortgagee, as it must be, the mortgagor shall pay no more than what is really due upon the bond; if an action of covenant was brought by the covenantee, the account must be settled in that action. In this Court, the condition of the assignee cannot be better than it would be at law in any mode he could take to recover what was due upon the assignment."

The principle is distinctly recognized that the measure of liability upon the instrument secured is the measure of the liability chargeable upon the security. The condition of the assignee cannot be better in law than it is in equity.

Page 83 U. S. 277

So neither can it be worse. Upon this ground we place our judgment.

We think the doctrine we have laid down is sustained by reason, principle, and the greater weight of authority.

Decree reversed and the case remanded with directions to enter a decree in conformity with this opinion.

[Footnote 1]

Powell on Mortgages 908; 1 Hilliard on Mortgages 572; Coot on Mortgages 304; Reeves v. Scully, Walker's Chancery 248; Fisher v. Otis, 3 Chandler 83; Martineau v. McCollum, 4 id. 153; Bloomer v. Henderson, 8 Mich. 395; Potts v. Blackwell, 4 Jones 58; Cicotte v. Gagnier, 2 Mich. 381; Pierce v. Faunce, 47 Me. 507; Palmer v. Yates, 3 Sandford 137; Taylor v. Page, 6 Allen 86; Croft v. Bunster, 9 Wis. 503; Cornell v. Hilchens, 11 id. 353.

[Footnote 2]

Hern v. Nichols, 1 Salkeld 289.

[Footnote 3]

Jackson v. Blodget, 5 Cowan 205; Jackson v. Willard, 4 Johnson 43.

[Footnote 4]

14 Ohio St. 396.

[Footnote 5]

47 Me. 513.

[Footnote 6]

4 Vesey 126.

# Exhibit G

# *Missouri Revised Statutes*

## Chapter 400
## Uniform Commercial Code
## Section *400-003.404*

August 28, 2013

**Impostors–fictitious payees.** 400.3-404. (a) If an impostor, by use of the mails or otherwise, induces the issuer of an instrument to issue the instrument to the impostor, or to a person acting in concert with the impostor, by impersonating the payee of the instrument or a person authorized to act for the payee, an endorsement of the instrument by any person in the name of the payee is effective as the endorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.

(b) If (i) a person whose intent determines to whom an instrument is payable (Section 400.3-110(a) or (b)) does not intend the person identified as payee to have any interest in the instrument, or (ii) the person identified as payee of an instrument is a fictitious person, the following rules apply until the instrument is negotiated by special endorsement:

(1) Any person in possession of the instrument is its holder.

(2) An endorsement by any person in the name of the payee stated in the instrument is effective as the endorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection.

(c) Under subsection (a) or (b), an endorsement is made in the name of a payee if (i) it is made in a name substantially similar to that of the payee or (ii) the instrument, whether or not endorsed, is deposited in a depositary bank to an account in a name substantially similar to that of the payee.

(d) With respect to an instrument to which subsection (a) or (b) applies, if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from payment of the instrument, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.

(L. 1992 S.B. 448)

*No continuity with § 400.3-404 as repealed by L. 1992 S.B. 448.

© Copyright

  Missouri General Assembly

## EXHIBIT H

Secretary of State Missouri

Corp. & Business Registration For:

Wells Fargo National Association

Wells Fargo Home Mortgage Corporation

America's Servicing Company (fictitious name)

Norwest Mortgage Company

# Missouri Secretary of State, Jason Kander

SOS Home :: Business Services :: Business Entity Search

Search
⟳By Business Name
⟳By Charter Number
⟳By Registered Agent
⟳For New Corporations
Verify
⟳Verify Certification
Registration Report
⟳File Online
File Fictitious Name
Registration
⟳File Online
⟳Renew Online
File LLC Registration
⟳File Online
Online Orders
⟳Register for Online
Orders
⟳Order Good Standing
⟳Order Certified Documents

## Filed Documents

**Date:** 11/7/2013    (Click above to view filed documents that are available.)

## Business Name History

| Name | Name Type |
|------|-----------|
| WELLS FARGO HOME MORTGAGE, INC. | Legal |
| NORWEST MORTGAGE, INC. | Prev Legal |

## General Business - Foreign - Information

| | |
|---|---|
| **Charter Number:** | F00417858 |
| **Status:** | Admin Dissolved Profit |
| **Entity Creation Date:** | 10/24/1995 |
| **State of Business.:** | CA |
| **Expiration Date:** | Perpetual |
| **Last Registration Report Filed Date:** | 4/28/2005 |
| **Last Registration Report Filed:** | 2005 |
| **Registration Report Month:** | January |

## Registered Agent

| | |
|---|---|
| **Agent Name:** | Secretary of State |
| **Office Address:** | 600 West Main Jefferson City MO 65102 |
| **Mailing Address:** | |

| Commissions | Corporations | UCC Office |
|---|---|---|
| **Phone: (573) 751-2783** | **Phone: (573) 751-4153** | **Phone: (573) 751-4628** |
| **Toll Free: (866) 223-6535** | **Toll Free: (866) 223-6535** | **Toll Free: (866) 223-6535** |

600 West Main Street
Jefferson City, MO 65101

Main Office: (573) 751-4936



Office of the Secretary of State
State of Missouri

ROBIN CARNAHAN                 Jefferson City              CORPORATIONS DIVISION
SECRETARY OF STATE                 65101                   (866) 223-6535 TOLL FREE

F00417858
WELLS FARGO HOME MORTGAGE, INC.
CSC- Lawyers Incorporating Service Company
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101

June 2, 2006

## IMPORTANT WRITTEN NOTICE

### YOUR ANNUAL REGISTRATION REPORT MUST BE RECEIVED BY August 1, 2006

**Immediate action is required! Our records indicate your annual registration report is PAST DUE. Failure to file your annual registration report by the date indicated above will result in:**

### ADMINISTRATIVE DISSOLUTION (Missouri Corporation)
or
### REVOCATION OF AUTHORITY TO DO BUSINESS (Foreign Corporation)

**For your business to remain in Good Standing, you are required to file the Annual Registration Report by the date above. Failure to file this report will result in the administrative dissolution of your corporate status; if administratively dissolved, you cannot legally conduct business in Missouri.**

**File your Annual Registration Report online 24 hours a day from our website at: www.sos.mo.gov <http://www.sos.mo.gov/>. Under "Featured Items" choose "File Annual Report Online". You will need your charter number (appears above your corporate name on this notice) and a credit card.**

**If you wish to file your annual report by mail, the paper form may be printed from the website above or ordered from our office by calling toll free (866) 223-6535. If filing a paper report, please complete and mail the annual registration report form, along with the appropriate filing and late fee, to:**
Secretary of State
PO Box 1366
Jefferson City, MO 65102

**If you have any questions regarding your Annual Registration Report, please contact us at the toll free number above or e-mail us at annrep@sos.mo.gov.**

For your convenience, you may also contact one of our field offices:

**Kansas City Office**          **Springfield Office**          **St. Louis Office**
615 East 13th St.               149 Park Central Square         Wainwright State Office Bldg.
5th Floor, Room 513             Room 624                        111 N. 7th, 2nd Floor, Rm. 234
Kansas City, MO 64106           Springfield, MO 65806           St. Louis, MO 63101
(816) 889-2925                  (417) 895-6330                  (314) 340-7490

# Missouri Secretary of State, Jason Kander

SOS Home :: Business Services :: Business Entity Search

Search
By Business Name
By Charter Number
By Registered Agent
For New Corporations
Verify
Verify Certification
Registration Report
File Online
File Fictitious Name
Registration
File Online
Renew Online
File LLC Registration
File Online
Online Orders
Register for Online
Orders
Order Good Standing
Order Certified Documents

Search Type: Starting With
Search Criteria: wells fargo home mortgage Corporation

Search Date: 11/7/2013
Search Time: 15:16

Click on the Business Entity Name or Charter Number to view more information.

| Business Entity Name | Charter Number | Type | Status | Entity Creation Date |
|---|---|---|---|---|
| NORWEST MORTGAGE, INC. | F00417858 | General Business | Admin Dissolved Profit | 10/24/1995 |
| WELLS FARGO HOME MORTGAGE, INC. | F00417858 | General Business | Admin Dissolved Profit | 10/24/1995 |

Records Returned 1 to 2

| Commissions | Corporations | UCC Office |
|---|---|---|
| Phone: (573) 751-2783 | Phone: (573) 751-4153 | Phone: (573) 751-4628 |
| Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 |

600 West Main Street
Jefferson City, MO 65101

Main Office: (573) 751-4936

# ADMINISTRATIVE DISSOLUTION
# OR REVOCATION FOR A
# FOR-PROFIT CORPORATION

F00417858
WELLS FARGO HOME MORTGAGE, INC.
CSC- Lawyers Incorporating Service Company
221 BOLIVAR STREET
JEFFERSON CITY, MO 65101

August 29, 2006

WELLS FARGO HOME MORTGAGE, INC.
F00417858

The above corporation has failed to comply with Section 351.484, 351.525, or 351.598 RSMo, by:

*Failure to file a correct and current annual report*

Therefore, the above corporation stands **administratively dissolved or revoked** under the provisions of Section 351.486 or Section 351.602, RSMo, as of August 29, 2006, subject to rescission as in these acts provided. **A corporation administratively dissolved may not carry on any business except that necessary to wind up and liquidate its business and affairs under Section 351.476.**

For further information, please contact the Corporations Division at (866) 223-6535 toll free

**Mark R. Reading**
**Executive Deputy Secretary of State**

# NOTICE OF EXPIRATION
# FOR A FICTITIOUS NAME REGISTRATION

X00372500
AMERICA'S SERVICING COMPANY
620 N MCKNIGHT RD
SAINT LOUIS,MO 63132-4911

**October 17, 2009**

AMERICA'S SERVICING COMPANY
X00372500

The above business has failed to comply with Section 417.210 RSMo, by:

*Failure to renew a fictitious name registration.*

Therefore, the above business stands **expired** under the provisions of Section 417.210 as of October 17, 2009.

If you wish to file a new fictitious name registration, please visit our web site at www.sos.mo.gov/business/corporations or for further information, please contact the Corporations Division toll free at (866) 223-6535.

**Rich Lamb**
Executive Deputy Secretary of State





# State of Missouri

No. X __372500__

### Rebecca McDowell Cook, Secretary of State

#### Corporation Division

## Registration of Fictitious Name
#### (Submit in duplicate with a filing fee of $7)

This information is for the use of the public and gives no protection to the name. There is no provision in this Chapter to keep another company or corporation from adopting and using the same name. (RSMo 417)

We, the undersigned, are doing business under the following name, and at the following address:

Name to be registered: __America's Servicing Company__

Missouri Business Address: __620 McKnight__
(P.O. Boxes not accepted)

City, State and Zip Code: __St. Louis, MO 63124__

The parties having an interest in the business, and the percentage they own are (if a corporation is owner, indicate corporation name and percentage owned). If all parties are jointly and severally liable, percentage of ownership need not be listed:

| Name of Owners, Individual or Corporate | Street and Number | City | State and Zip Code | If listed, Percentage of ownership must equal 100% |
|---|---|---|---|---|
| Norwest Mortgage, Inc., MAC X2406-011, 1 Home Campus, Des Moines, IA 50328-000 | | | | 100% |
| F 417858 AG | | | | |

(Must be typed or printed)

Return to: Secretary of State
   Corporation Division
   P.O. Box 778
   Jefferson City, Mo. 65102

Corp. #5a (12-94)

# FILED

APR 23 2000

*Rebecca McDowell Cook*
SECRETARY OF STATE



The undersigned, being all the parties owning interest in the above company, being duly sworn, upon their oaths each did say that the statements and matters set forth herein are true.

**372500**

Individual
Owners
Sign Here

X _____     X _____

X _____     X _____

X _____     X _____

The undersigned corporation has caused this application to be executed in its name by its President or Vice-President and its Secretary or Assistant Secretary, this _____ 3rd _____

day of _____ December _____ , 19 99

If
Corporation
is
Owner,
Corporate
Officers
Execute
Here

_____ Norwest Mortgage, Inc. _____
(Exact Corporate Title)

By _____
Its President or Vice-President

By _____
Its Secretary or Assistant Secretary

{Corporate Seal}
If no seal, state "none".

State of ~~Missouri~~ IOWA

County of _____ Polk _____ } SS

I, _____ Lisa Bartlett _____ , A Notary Public, do hereby certify that on the _____ 3rd _____

day of _____ December _____ , 19 99 _____ personally appeared before me _____

and being first duly sworn by me, acknowledged that _____ he signed as his own free act and deed the foregoing

document in the capacity therein set forth and declared that the statements therein contained are true.

IN WITNESS WHEREOF, I have hereunto set my hand and seal the day and year before written.

(Notarial Seal)

**LISA BARTLETT**
MY COMMISSION EXPIRES
November 7, 2001

_____
Notary Public

My commission expires _____ 11/7/01 _____

My county of Commission _____ Polk _____

Corp. #56



**Rebecca McDowell Cook, Secretary of State**
P.O. Box 778, Jefferson City, Mo. 65102
Corporation Divison

## Application for Foreign Corporation
## For a Certificate of Authority

FILED
AND CERTIFICATE OF
AUTHORITY ISSUED

(Submit in duplicate with filing fee of $155.00)

OCT 24 1995

(1) The corporation's name is Norwest Mortgage, Inc.

and it is organized and existing under the laws of California

~~Rebecca McDowell Cook~~
SEC'T OF STATE

(2) The name it will use in Missouri is Norwest Mortgage, Inc.

(3) The date of its incorporation was 10/13/64 , and the period of its duration is Perpetual
    <small>month/day/year</small>

(4) The address of its principal place of business 405 SW 5th Street, DesMoines, Iowa 50309
    <small>Address                           City/State/Zip</small>

(5) The name and address of its registered agent and office in the State of Missouri is
    The Corporation Company, 7733 Forsyth Blvd., Clayton, Missouri 63105
    <small>Name                    Address                           City/State/Zip</small>

(6) The specific purpose(s) of its business in Missouri are:

    Mortgage lending and related activities.

(7) The name of its officers and directors and their business addresses are as follows:

| (Officers) | Name | Address | City/State/Zip |
|---|---|---|---|
| President | See attached list of officers | | |
| Vice President | | | |
| Secretary | | | |
| Treasurer | | | |

**(Board of Directors)**

| | | | |
|---|---|---|---|
| Director | Michael J. Keller, 405 SW 5th Street, Des Moines, Iowa 50309 | | |
| Director | Stephen D. Morrison, 405 SW 5th Street, Des Moines, Iowa 50309 | | |
| Director | Mark C. Oman, 405 SW 5th Street, Des Moines, Iowa 50309 | | |
| Director | Stanley S. Stroup, Sixth and Marquette, Minneapolis, Minnesota 55479-1026 | | |

(8) The effective date of this document is the date it is filed by the Secretary of State of Missouri, unless you indicate a future date, as follows: N/A
    <small>(Date may not be more than 90 days after the filing date in this office)</small>

In affirmation thereof, the facts stated above are true.

*Emily E. Haddad*                     Vice President          Septembaer 14, 1995
<small>(Authorized signature of officer or chairman of the board)          (Title)                    (Date of Signature)</small>
                    Emily E.Haddad

Note: You must have a current certificate of good standing or certificate of existence with this application. This may be obtained from the Secretary of State or other authority that issues corporate charters.

Corp. #42 (12-94) (MO. – 159 – 3/7/95)

Appendix to Missouri
Application for Foreign Corporation for a Certificate of Authority

# Officers of
# Norwest Mortgage, Inc.

1. Michael J. Keller, Executive Vice President
   405 SW 5th Street
   Des Moines, Iowa 50309

2. Stephen D. Morrison, Senior Vice Pres & Secretary
   405 SW 5th Street
   Des Moines, Iowa 50309

3. Mark C. Oman, President
   405 SW 5th Street
   Des Moines, Iowa 50309

4. Peter J. Wissinger, Executive Vice President
   405 SW 5th Street
   DesMoines, Iowa 50309

5. Chuck Ohmer, Executive Vice President
   405 SW 5th Street
   DesMoines, Iowa 50309

6. Mark Faris, Executive Vice President
   3601 Minnesota Drive, Ste 200
   Bloomington, Minnesota 55435

7. David Boberg, Senior Vice President
   405 SW 5th Street
   DesMoines, Iowa 50309

8. Manual J. Siprut, Vice President
   405 SW 5th Street
   DesMoines, Iowa 50309

9. Cara K. Heiden, Senior Vice President
   405 SW 5th Street
   DesMoines, Iowa 50309

10. Alta Jones, Senior Vice Pres & CFO
    405 SW 5th Street
    DesMoines, Iowa 50309

11. Judith K. Tonti, Vice President
    405 SW 5th Street
    DesMoines, Iowa 50309

12. Connie L. McCullough, Vice President
    405 SW 5th Street
    DesMoines, Iowa 50309

Case 4:14-cv-00007-BCW    Document 1-2    Filed 01/03/14    Page 51 of 95

## Appendix to  (cont)

13. Emily E. Haddad, Vice President
    Sixth and Marquette
    Minneapolis, Minnesota  55479-1026

14. Margaret M. Weber, Assistant Secretary
    Sixth and Marquette
    Minneapolis, Minnesota  55479-1026

Page 2




# State of California

**SECRETARY OF STATE**

## CERTIFICATE OF STATUS
## DOMESTIC CORPORATION

*I, BILL JONES, Secretary of State of the State of California, hereby certify:*

That on the _____13th_____ day of _____October_____, 19 __64__,

_____NORWEST MORTGAGE, INC._____

became incorporated under the laws of the State of California by filing its Articles of Incorporation in this office; and

That no record exists in this office of a certificate of dissolution of said corporation nor of a court order declaring dissolution thereof, nor of a merger or consolidation which terminated its existence; and

That said corporation's corporate powers, rights and privileges are not suspended on the records of this office; and

That according to the records of this office, the said corporation is authorized to exercise all its corporate powers, rights and privileges and is in good legal standing in the State of California; and

That no information is available in this office on the financial condition, business activity or practices of this corporation.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this **11th** day of **September, 1995**

**BILL JONES**
Secretary of State

SEC/STATE FORM CE-112 (REV. 1-95)

94 25216

ST

No. F00417858



**Rebecca McDowell Cook**
**Secretary of State**

CORPORATION DIVISION - CERTIFICATE OF AUTHORITY

WHEREAS,
 NORWEST MORTGAGE, INC.

USING IN MISSOURI THE NAME
 NORWEST MORTGAGE, INC.

HAS COMPLIED WITH THE GENERAL AND BUSINESS CORPORATION LAW
WHICH GOVERNS FOREIGN CORPORATIONS; BY FILING IN THE OFFICE
OF THE SECRETARY OF STATE OF MISSOURI AUTHENTICATED EVIDENCE
OF ITS INCORPORATION AND GOOD STANDING UNDER THE LAWS OF THE
STATE OF CALIFORNIA.

NOW, THEREFORE, I, REBECCA McDOWELL COOK, SECRETARY OF
STATE OF THE STATE OF MISSOURI, DO HEREBY CERTIFY THAT SAID
CORPORATION IS FROM THIS DATE DULY AUTHORIZED TO TRANSACT
BUSINESS IN THIS STATE, AND IS ENTITLED TO ALL RIGHTS AND
PRIVILEGES GRANTED TO FOREIGN CORPORATIONS UNDER THE GENERAL
AND BUSINESS CORPORATION LAW OF MISSOURI.

IN TESTIMONY WHEREOF,  I HAVE SET MY
HAND AND IMPRINTED THE GREAT SEAL OF
THE STATE OF MISSOURI,  ON THIS, THE
24TH DAY OF OCTOBER, 1995.

**Secretary of State**

$155.00

S.O.S. #30

# EXHIBIT I

# Secretary of State of Missouri Registration Documents For

# Taylor, Bean & Whitaker Mortgage Corp

$Exhibit\ I$

# Missouri Secretary of State, Jason Kander

SOS Home :: Business Services :: Business Entity Search

Search
○By Business Name
○By Charter Number
○By Registered Agent
○For New Corporations
    Verify
○Verify Certification
    Registration Report
○File Online
    File Fictitious Name
    Registration
○File Online
○Renew Online
    File LLC Registration
○File Online
    Online Orders
○Register for Online
    Orders
○Order Good Standing
○Order Certified Documents

## Filed Documents

**Date:** 11/7/2013    (Click above to view filed documents that are available.)

### Business Name History

| Name | Name Type |
|---|---|
| TAYLOR, BEAN & WHITAKER MORTGAGE CORP. | Legal |

### General Business - Foreign - Information

| | |
|---|---|
| **Charter Number:** | F00464444 |
| **Status:** | Admin Dissolved Profit |
| **Entity Creation Date:** | 1/5/1999 |
| **State of Business.:** | FL |
| **Expiration Date:** | Perpetual |
| **Last Registration Report Filed Date:** | 8/20/2008 |
| **Last Registration Report Filed:** | 2008 |
| **Registration Report Month:** | May |

### Registered Agent

| | |
|---|---|
| **Agent Name:** | Secretary of State |
| **Office Address:** | 600 West Main Jefferson City MO 65102 |
| **Mailing Address:** | |

| **Commissions** | **Corporations** | **UCC Office** |
|---|---|---|
| Phone: (573) 751-2783 | Phone: (573) 751-4153 | Phone: (573) 751-4628 |
| Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 |

600 West Main Street
Jefferson City, MO 65101

Main Office: (573) 751-4936

# ADMINISTRATIVE DISSOLUTION
# OR REVOCATION FOR A
# FOR-PROFIT CORPORATION

F00464444
TAYLOR, BEAN & WHITAKER MORTGAGE CORP.
C T CORPORATION SYSTEM
120 SOUTH CENTRAL AVENUE
CLAYTON, MO 63105

December 22, 2009

TAYLOR, BEAN & WHITAKER MORTGAGE CORP.
F00464444

The above corporation has failed to comply with Section 351.484 or 351.598 RSMo, by:

*Failure to file a correct and current annual report*

Therefore, the above corporation stands **administratively dissolved or revoked** under the provisions of Section 351.486 or Section 351.602, RSMo, as of December 22, 2009, subject to rescission as in these acts provided. **A corporation administratively dissolved may not carry on any business except that necessary to wind up and liquidate its business and affairs under Section 351.476.**

**To request reinstatement forms please include your name, mailing address, telephone number, entity name and entity charter number by email to rescissions@sos.mo.gov <mailto:rescissions@sos.mo.gov>; by fax (573) 751-5841 or call toll free (866) 223-6535.**

For further information, please contact the Corporations Division at (866) 223-6535 toll free.

Rich Lamb
Executive Deputy Secretary of State



### State of Missouri

### Rebecca McDowell Cook, Secretary of State

P.O. Box 778, Jefferson City, MO 65102
Corporation Division



F I L E D

AND CERTIFICATE OF
AUTHORITY ISSUED

**JAN 0 5 1999**

### Application for Foreign Corporation
### for a Certificate of Authority

*Rebecca McDowell Cook*
SECRETARY OF STATE

(Submit in duplicate with filing fee of $155.00)

(1) The corporation's name is <u>Taylor, Bean & Whitaker Mortgage Corp.</u>
and it is organized and existing under the laws of <u>Florida</u>

(2) The name it will use in Missouri is <u>Taylor, Bean & Whitaker Mortgage Corp.</u>

(3) The date of its incorporation was <u>5/23/91</u> (month/day/year),
and the period of its duration is <u>Perpetual</u>

(4) The address of its principal place of business (Address/City/State/Zip)
101 NE 2nd Street, Ocala, Florida  34470

(5) The name and address of its registered agent and office in the State of
Missouri is (Name, Address, City/State/Zip)
C T Corporation System, 120 South Central Avenue, Clayton, Missouri  63105

(6) The specific purpose(s) of its business in Missouri are: _____

Mortgage Banking

(7) The name of its officers and directors and their business addresses are as
follows:

**Officers** (Name/Address/City/State/Zip)

President        See attached list of officers

Vice President

Secretary

(MO032 - 6/16/98)

Treasurer _____

**Board of Directors** (Name/Address/City/State/Zip)

Director _____ See attached list of directors _____

Director _____ _____

Director _____

Director _____

(8)   The effective date of this document is the date it is filed by the Secretary of State of Missouri, unless you indicate a future date, as follows:

_____

(Date may not be more than 90 days after the filing date in this office)

In affirmation thereof, the facts stated above are true.

_____ Secretary  1 2/28/98
(Authorized signature of officer or chairman of the board) (Title) (Date)

Note: You must have a current certificate of good standing or certificate of existence with this application. This may be obtained from the Secretary of State or other authority that issues corporate charters.

_____

**Office of Secretary of State Rebecca McDowell Cook**
**600 W. Main and 208 State Capitol, P.O. Box 778, Jefferson City, Missouri 65102**
**Telephone: (573) 751-4936**

*Information contained in this document was compiled using publications from the Secretary of State's Office*

_____

7/96

# FILED
### AND CERTIFICATE OF
### AUTHORITY ISSUED

## JAN 0 5 1999

*Rebecca McDowell Cook*
SECRETARY OF STATE

(MO032)

Sherry Dickinson
President & Director

Business Address:    101 NE 2nd Street
                     Ocala, FL  34470-6640

Residence Address:   10699 SW 110 Ave
                     Dunnellon, FL  34478


Lee B. Farkas
Secretary & Director

Business Address     101 NE 2nd Street
                     Ocala, FL  34470

Residence Address    480 SW 87 Place
                     Ocala, FL  34476


Greg H. Crocker
Vice President

Business Address     101 NE 2nd Street
                     Ocala, FL  34470

Residence Address    175 SE 32 Place
                     Ocala, Fl  34471


Coda C. Roberson III
Director

Business Address     101 NE 2nd Street
                     Ocala, FL  34470

Residence Address    480 SW 87 Place
                     Ocala, FL  34476



# State of Florida

### Department of State

I certify from the records of this office that TAYLOR, BEAN & WHITAKER MORTGAGE CORP., is a corporation organized under the laws of the State of Florida, filed on May 23, 1991.

The document number of this corporation is S55203.

I further certify that said corporation has paid all fees and penalties due this office through December 31, 1998, that its most recent annual report was filed on April 3, 1998, and its status is active.

I further certify that said corporation has not filed Articles of Dissolution.

Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capitol, this the
Twenty-ninth day of December, 1998

*Sandra B. Mortham*

Sandra B. Mortham
Secretary of State

CR2EO22 (2-95)

No. F00464444



# STATE OF MISSOURI

**Rebecca McDowell Cook**
**Secretary of State**

### CORPORATION DIVISION - CERTIFICATE OF AUTHORITY

WHEREAS,
TAYLOR, BEAN & WHITAKER MORTGAGE CORP.

USING IN MISSOURI THE NAME
TAYLOR, BEAN & WHITAKER MORTGAGE CORP.

HAS COMPLIED WITH THE GENERAL AND BUSINESS CORPORATION LAW
WHICH GOVERNS FOREIGN CORPORATIONS; BY FILING IN THE OFFICE
OF THE SECRETARY OF STATE OF MISSOURI AUTHENTICATED EVIDENCE
OF ITS INCORPORATION AND GOOD STANDING UNDER THE LAWS OF THE
STATE OF FLORIDA.

NOW, THEREFORE, I, REBECCA MCDOWELL COOK, SECRETARY OF
STATE OF THE STATE OF MISSOURI, DO HEREBY CERTIFY THAT SAID
CORPORATION IS FROM THIS DATE DULY AUTHORIZED TO TRANSACT
BUSINESS IN THIS STATE, AND IS ENTITLED TO ALL RIGHTS AND
PRIVILEGES GRANTED TO FOREIGN CORPORATIONS UNDER THE GENERAL
AND BUSINESS CORPORATION LAW OF MISSOURI.

IN TESTIMONY WHEREOF, I HAVE SET MY
HAND AND IMPRINTED THE GREAT SEAL OF
THE STATE OF MISSOURI, ON THIS, THE
5TH DAY OF JANUARY, 1999.

_Rebecca M Dowell Cook_
**Secretary of State**

$155.00

S.O.S. #30

# Missouri Secretary of State, Jason Kander

Search
⌖By Business Name
⌖By Charter Number
⌖By Registered Agent
⌖For New Corporations
Verify
⌖Verify Certification
Registration Report
⌖File Online
File Fictitious Name
Registration
⌖File Online
⌖Renew Online
File LLC Registration
⌖File Online
Online Orders
⌖Register for Online
Orders
⌖Order Good Standing
⌖Order Certified Documents

Search Type:
Starting With

Search Criteria:
Taylor Bean and
Whitaker

Search Date:
11/7/2013

Search Time: 13:36

Click on the Business Entity Name or Charter Number to view more information.

| Business Entity Name | Charter Number | Type | Status | Entity Creation Date |
|---|---|---|---|---|
| TAYLOR, BEAN & WHITAKER MORTGAGE CORP. | F00464444 | General Business | Admin Dissolved Profit | 1/5/1999 |

Records Returned 1 to 1

| Commissions | Corporations | UCC Office |
|---|---|---|
| Phone: (573) 751-2783 | Phone: (573) 751-4153 | Phone: (573) 751-4628 |
| Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 |

600 West Main Street
Jefferson City, MO 65101

Main Office: (573) 751-4936

# Taylor, Bean & Whitaker

From Wikipedia, the free encyclopedia

| Taylor, Bean & Whitaker Mortgage Corp. | |
|---|---|
| **Type** | Privately owned company |
| **Industry** | Finance and Mortgage |
| **Founded** | 1982 |
| **Headquarters** | Ocala, Florida |
| **Key people** | Lee Farkas, Chairman<br>Paul R. Allen, CEO<br>Ray Bowman, President<br>Stuart Scott, COO |
| **Products** | Mortgages |
| **Employees** | 2,000 (approx.) |
| **Website** | Taylor, Bean & Whitaker |

**Taylor, Bean & Whitaker** was a top-10 wholesale mortgage lending firm, the fifth-largest issuer of GNMA securities.

On August 14, 2009, following an FBI raid and suspension by the Federal Housing Administration from issuing FHA mortgage loans and Ginnie Mae mortgage-backed securities, it ceased business operations. In April 2011, its majority owner was convicted of 14 counts of securities, bank, and wire fraud and conspiracy to commit fraud, and sentenced to 30 years in federal prison. Deutsche Bank and BNP Paribas have sued Bank of America, the trustee and collateral agent of Taylor Bean's Ocala subsidiary, over $1.75 billion in losses stemming from the subsidiary's fraud.

I

Case 4:14-cv-00007-BCW    Document 1-2    Filed 01/03/14    Page 64 of 95

/contents
   [hide]
1 History
1.1 FBI
raid,
suspensio
n, and
closure
1.2 Ocala
Funding;
Lawsuit
by
Deutsche
Bank and
BNP
Paribas
1.3 Execu
tive
convictio
ns
2 Referen
ces

3 Externa
l links

# History[edit]

Taylor, Bean & Whitaker closed $35 billion in residential mortgage loans in 2007. It employed about 2,000 workers, and was the fifth-largest issuer of GNMA securities.[1]

## FBI raid, suspension, and closure[edit]

On August 3, 2009, FBI Agents raided the company's headquarters in Ocala, Florida, in connection with an investigation related to the company's acquisition of a majority stake in Colonial BancGroup. Taylor, Bean & Whitaker had signed a deal on March 31, 2009, to become the majority owner of Colonial BancGroup in a $300 million equity stake. The next day, the Federal Housing Administration suspended the company from issuing FHA mortgage loans and Ginnie Mae mortgage-backed securities.[2][3] On August 14, 2009, Taylor, Bean & Whitaker ceased business operations, and terminated all employees at its headquarters.[4]

## Ocala Funding; Lawsuit by Deutsche Bank and BNP Paribas[edit]

In 2005, Taylor Bean created and then subsequently operated a special-purpose entity subsidiary, Ocala Funding. Ocala was a conduit which purchased its home loans, and bundled them into securities which it then sold to Freddie Mac and other investors.[5][6] It funded the mortgage loan business by selling $1.75 billion of worthless asset-backed commercial paper short-term notes to Deutsche Bank and the mortgage subsidiary of BNP Paribas.[5][6][7]

2

Ocala hired Bank of America as both its trustee and collateral agent for the Ocala commercial paper.[8]Deutsche Bank and BNP Paribas sued Bank of America over the $1.75 billion in losses stemming from the fraud, saying their agreements required that Ocala hold $1.6 billion in cash or mortgage loans ascollateral to be deposited with Bank of America, and that Bank of America breached its custodial and trustee obligations and improperly transferred billions of dollars of funds that were serving as collateral at Ocala's request.[5][6][8][9][10]

The case is being heard by Judge Robert Sweet in the United States District Court for the Southern District of New York.[5][6][11] Sweet allowed some of the case to proceed in March 2011, writing that Deutsche Bank and BNP Paribas had stated a "plausible claim" against Bank of America.[8][9]

## Executive convictions[edit]
On April 19, 2011, a federal jury in Alexandria, Virginia, convicted Lee Farkas, the majority owner of the company, of 14 counts of securities fraud, bank fraud, and wire fraud and conspiracy to commit fraud. According to the government case, the multi-billion dollar fraud caused the downfall of Colonial Bank and cheated investors and the government. The fraud began in 2002 when Taylor overdrew its account with Colonial BancGroup by several million dollars. Taylor Bean then promised to cover the amount by the end of the day in a process known as sweeping. When the overdrafts grew to over $100 million, mid-level Taylor Bean executives sold Colonial BancGroup $1 billion in mortgages that it did not own.

During his sentencing hearing on June 30, 2011, Farkas read a statement saying that he "strived to be a good person." However, Federal District Judge Leonie Brinkema replied that she did not observe any genuine remorse, and sentenced the 58-year-old Farkas to 30 years in federal prison.[12] Farkas is currently serving his sentence in a medium-security facility at the Butner Federal Correctional Complex inButner, North Carolina, and is scheduled for release in 2037.[13]

The company's former chief executive and lead manager for Ocala Funding (Paul R. Allen; admitted to allowing $1.5 billion in collateral to be misappropriated from Ocala; sentenced in 2011 to 40 months in prison, followed by two years of supervised release) and treasurer (Desiree Brown; sentenced to six years in prison) pleaded guilty and cooperated in the case against Farkas, and other executives received sentences ranging from three months (senior financial analyst Sean Ragland) to eight years.[12][14][15]

## References[edit]

1. ^ "Top GNMA Issuers". US Banker (Source Media, Inc). July 1, 2008. Retrieved May 7, 2009.
2. ^ "Taylor, Bean & Whitaker shuts its doors". Susan Latham Carr (Ocala.com). August 5, 2009. Retrieved August 5, 2009.
3. ^ "FHA SUSPENDS TAYLOR, BEAN & WHITAKER MORTGAGE CORP. AND PROPOSES TO SANCTION TWO TOP OFFICIALS". Brian Sullivan (U.S. Housing and Urban Development). August 4, 2009. Retrieved August 5, 2009.
4. ^ "Feds raid Colonial Bank office in Florida".Jane Sutton (Thompson Reuters). August 3, 2009. Retrieved August 5, 2009.
5. ^ a b c d "Taylor Bean Liquidation Plan Is Cleared". wsj.com. July 22, 2011. Retrieved April 2, 2013.
6. ^ a b c d Amon, Elizabeth (March 28, 2011)."Stanford, BNP, Madoff, HSBC, Glaxo, Galleon in Court News". Bloomberg.com. Retrieved April 2, 2013.
7. ^ [1][dead link]

# Information about Taylor, Bean & Whitaker Mortgage Corp.

Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), headquartered in Ocala, Florida, issued a press release dated August 5, 2009, which announced that it had ceased all mortgage loan origination operations as of that date, and that TBW was unable to close or fund any mortgage loans pending in its pipeline as of that date.

On August 7 and 11, 2009, the Federal Housing Administration (FHA) posted on the HUD / FHA Web site consumer guidance and industry guidance relating to the FHA loans, which TBW had been originating or servicing. You may access the information on the FHA Web site by clicking on the following links: http://www.hud.gov/news/consumer-guidance.pdf and http://www.hud.gov/news/industry-guidance.pdf.
On August 18, 2009, TBW posted on its Web site information for its home mortgage customers relating to the transfer of certain existing mortgages to new servicers and instructions to certain customers relating to making payments. For more information you may access the TBW Web site by clicking on the following link: http://www.taylorbean.com/.

- Information is available for homeowners with loans securitized by **Ginnie Mae** that were being serviced by TBW (According to Ginnie Mae's Web site, "If your loan was insured by the Federal Housing Administration, Veterans Administration or USDA's Rural Development, it was likely securitized by Ginnie Mae.") Read the questions and answers by visiting the Ginnie Mae Web site (www.ginniemae.gov) or by clicking the following link: http://www.ginniemae.gov/media/TBW_consumer_grid.pdf.

Information is available for homeowners with loans owned by **Freddie Mac** that were being serviced by TBW. Read the questions and answers by visiting the Freddie Mac Web site (www.freddiemac.com).

Borrowers, whose TBW loans have been transferred to Cenlar FSB (Federal Savings Bank) for servicing, may obtain more information by visiting Cenlar's Web site (www.cenlar.com) or by clicking the following link: http://www.cenlar.com/TBW.htm.

Borrowers, whose TBW loans have been transferred to Saxon Mortgage Services, Inc. for servicing, may obtain more information by visiting Saxon's Web site (www.saxononline.com) or by clicking the following link: https://www.saxononline.com/common/home/servicingUpdate.aspx.

Borrowers, whose TBW loans have been transferred to Ocwen Loan Servicing, LLC, may obtain more information about their new servicer by visiting Ocwen's Web site (https://www.ocwencustomers.com/home.cfm). (As of the time of this update, we found general information for mortgage customers but no specific information for TBW customers.)

TBW customers, who also have issues with Colonial Bank, Montgomery, Alabama, should be aware that the Alabama State Banking Department closed Colonial Bank on August 14, 2009, and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. Customers with questions about these events may call the FDIC at 1-888-206-4662 or visit the FDIC Web site at www.fdic.gov or click the following link: http://www.fdic.gov/bank/individual/failed/colonial-al.html.

On August 24, 2009, TBW announced that it had filed for relief under Chapter 11 of the U.S. Bankruptcy Code, and that its case would be administered before the United States Bankruptcy Court in Jacksonville, Florida. Read the copyrighted news article on www.ocala.com by clicking the following link: http://www.ocala.com/article/20090824/ARTICLES/908249956/1402/NEWS?Title=Taylor-Bean-has-filed-for-bankruptcy.

On September 1, 2009, a copyrighted news article on www.ocala.com reported that certain TBW bank accounts at Colonial Bank have been frozen by the FDIC and that a resolution is being sought in the pending U.S. Bankruptcy Court proceeding. Read the copyrighted news article by clicking on the following link: http://www.ocala.com/article/20090901/ARTICLES/909011003.

The Official Committee of Unsecured Creditors in the TBW Chapter 11 Bankruptcy has established a Webpage to provide information to all unsecured creditors. The Webpage can be accessed at http://www.bmcgroup.com/tbwmortgage, and at the top of that page click on "Taylor, Bean & Whitaker Mortgage Corp. Creditors Committee Webpage." Scroll down to "Significant Events & Press Releases" and click

(As of the time of this update, we found general information for mortgage customers but no specific information for TBW customers.)

TBW customers, who also have issues with Colonial Bank, Montgomery, Alabama, should be aware that the Alabama State Banking Department closed Colonial Bank on August 14, 2009, and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. Customers with questions about these events may call the FDIC at 1-888-206-4662 or visit the FDIC Web site at www.fdic.gov or click the following link:http://www.fdic.gov/bank/individual/failed/colonial-al.html.

On August 24, 2009, TBW announced that it had filed for relief under Chapter 11 of the U.S. Bankruptcy Code, and that its case would be administered before the United States Bankruptcy Court in Jacksonville, Florida. Read the copyrighted news article on www.ocala.com by clicking the following link:http://www.ocala.com/article/20090824/ARTICLES/908249956/1402/NEWS?Title=Taylor-Bean-has-filed-for-bankruptcy.

On September 1, 2009, a copyrighted news article on www.ocala.com reported that certain TBW bank accounts at Colonial Bank have been frozen by the FDIC and that a resolution is being sought in the pending U.S. Bankruptcy Court proceeding. Read the copyrighted news article by clicking on the following link:http://www.ocala.com/article/20090901/ARTICLES/909011003.

The Official Committee of Unsecured Creditors in the TBW Chapter 11 Bankruptcy has established a Webpage to provide information to all unsecured creditors. The Webpage can be accessed athttp://www.bmcgroup.com/tbwmortgage, and at the top of that page click on "Taylor, Bean & Whitaker Mortgage Corp. Creditors Committee Webpage." Scroll down to "Significant Events & Press Releases" and click on "Summary of current status of case" as of March 2010. Also look for any subsequent updates.

The following information is not specific to the TBW situation but may be useful general information for borrowers to have in dealing with their present or future mortgage situations.

A federal law known as the Real Estate Settlement Procedures Act (RESPA) governs the notice of transfer and other protections for the borrower. One can read more about this subject on the Web site of the U.S. Department of Housing and Urban Development (HUD), www.hud.gov. One might start with HUD's article, "Your rights and the Responsibilities of the Mortgage Servicer," by clicking on the following link:http://www.hud.gov/offices/hsg/ramh/res/rightsmtgesrvcr.cfm.

One can read about various mortgage lender closing and bankruptcy scenarios on the Web site of the Federal Trade Commission (FTC), www.ftc.gov. One might start with the FTC Facts for Consumers article, "How to Manage Your Mortgage If Your Lender Closes or Files for Bankruptcy," by clicking on the following link:http://www.ftc.gov/bcp/edu/pubs/consumer/homes/rea12.shtm.

With regard to the crediting of loan payments, a borrower may want to keep a close watch on bank records and mortgage servicer records to verify proper crediting of each payment. One can read the FTC Facts for Consumers article, "Mortgage Servicing: Making Sure Your Payments Count," to learn more on this and other servicing issues, by clicking on the following link:http://www.ftc.gov/bcp/edu/pubs/consumer/homes/rea10.shtm.

*NOTE: The consumer information provided on the Web site of the Georgia Department of Banking and Finance is*

Missouri Secretary of State

Page 1 of 1

# Missouri Secretary of State, Jason Kander

SOS Home :: Business Services :: Business Entity Search

| | | | | |
|---|---|---|---|---|
Search Type: Starting With  Search Criteria: norwest mortgage, inc.

Search Date: 11/7/2013    Search Time: 15:25

Click on the Business Entity Name or Charter Number to view more information.

| Business Entity Name | Charter Number | Type | Status | Entity Creation Date |
|---|---|---|---|---|
| BANCO MORTGAGE COMPANY | F00182605 | General Business | Withdrawn by Merger | 4/1/1976 |
| GMAC MORTGAGE CORPORATION OF IOWA | F00182605 | General Business | Withdrawn by Merger | 4/1/1976 |
| NORWEST FUNDING, INC. | F00255472 | General Business | Inactive | 8/26/1983 |
| NORWEST MORTGAGE CLOSING SERVICES, INC. | F00325349 | General Business | Forfeited | 3/6/1989 |
| NORWEST MORTGAGE, INC. | F00417858 | General Business | Admin Dissolved Profit | 10/24/1995 |
| NORWEST MORTGAGE, INC. | F00255472 | General Business | Inactive | 8/26/1983 |
| NORWEST MORTGAGE, INC. | F00182605 | General Business | Withdrawn by Merger | 4/1/1976 |
| NW ISSUANCE, INC. | F00255472 | General Business | Inactive | 8/26/1983 |
| WELLS FARGO HOME MORTGAGE, INC. | F00417858 | General Business | Admin Dissolved Profit | 10/24/1995 |

Records Returned 1 to 9

| Commissions | Corporations | UCC Office |
|---|---|---|
| Phone: (573) 751-2783 | Phone: (573) 751-4153 | Phone: (573) 751-4628 |
| Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 | Toll Free: (866) 223-6535 |

600 West Main Street
Jefferson City, MO 65101

Main Office: (573) 751-4936

https://www.sos.mo.gov/BusinessEntity/soskb/SearchResults.asp?FormName=CorpName...    11/5/2013

Case 4:14-cv-00007-BCW    Document 1-2    Filed 01/03/14    Page 69 of 95



**State of California**

## SECRETARY OF STATE

### CERTIFICATE OF FILING

I, BILL JONES, Secretary of State of the State of California, hereby certify:

That on the **1st day of January, 2001,** there was filed in this office a(n)

**Agreement of Merger** merging **CROSSLAND MORTGAGE CORP.,** a(n) **Utah**

corporation, into **WELLS FARGO HOME MORTGAGE, INC.,** a California

corporation, and the surviving corporation, by the terms of said agreement.

## FILED

DEC 1 2 2001

*Matt Black*
SECRETARY OF STATE

IN WITNESS WHEREOF, I execute this
certificate and affix the Great Seal
of the State of California this day
of December 10, 2001.



BILL JONES
Secretary of State

tb

NP-24 A (Rev. 1-96)                                                                OSP 99 21630

# STATE OF MISSOURI
## Department of Revenue

Telephone: (573) 751-6547
Fax: (573) 751-9409
E-mail: franchisetax@mail.dor.state.mo.us



---

DATE: December 3, 2001

CORPORATION NUMBER: F00385750

CORPORATION NAME: CROSSLAND MORTGAGE CORP.

Dear Corporation,

In response to your request for a franchise tax clearance, please be advised that the corporation indicated above has no delinquencies at this time with respect to the filing of all required franchise tax reports and payments of all required franchise taxes, penalties and interest.

Also, please be advised that this letter is null and void thirty (30) days from the date of this letter.

If you should have any questions, please contact the Division of Taxation & Collection, P.O. Box 3666, Jefferson City, MO. 65105-3666.

Sincerely,

Department of Revenue
Franchise Tax Division



# OFFICE OF THE SECRETARY OF STATE
## STATE OF MISSOURI
### JEFFERSON CITY
#### 65101

**MATT BLUNT**
SECRETARY OF STATE

CORPORATIONS DIVISION
(573) 751-4178
KAREN A. BRONDEL

DECEMBER 12, 2001

COLE COUNTY ABSTRACT
ATTN: KRIS VANDER VEEN
240 E. HIGH STREET
JEFFERSON CITY, MO 65101

**Re:    WELLS FARGO HOME MORTGAGE, INC. (#F00417858)**

Dear Corporation:

This is to advise you that on the day shown below we have filed for record in this office a merger between:

## CROSSLAND MORTGAGE CORP. (#F00385750)

### INTO:

## WELLS FARGO HOME MORTGAGE, INC. (#F00417858)

This merger was filed in this office on  **DECEMBER 12, 2001.**

The merger was effective in the home state of the survivor on  **JANUARY 1, 2001.**

The survivor is qualified to transact business in Missouri.

The fee for filing a merger is $25.00, plus $1.00 for each additional foreign-corporation qualified in Missouri over two in number. If you did not send us a check for that amount, a bill for the correct amount is being sent to you.

**FILED**

**DEC 1 2 2001**

SECRETARY OF STATE

Sincerely,

MATT BLUNT
Secretary of State
Corporation Division

JAMES C. KIRKPATRICK STATE INFORMATION CENTER
600 W. MAIN STREET • PO BOX 778 • JEFFERSON CITY 65102

ADMINISTRATIVE RULES • BUSINESS SERVICES • ELECTIONS • PUBLICATIONS • SECURITIES • STATE ARCHIVES • STATE LIBRARY • WOLFNER LIBRARY

# EXHIBIT J

Copies of the alleged Promissory Note and Deed of
Trust as they looked at closing provided by

America's Servicing Company.

They are fatally flawed by different terms.



PO Box 10328
Des Moines, IA 50306-0328

May 16, 2012

William Anthony Alexander
Deborah Marie Alexander
3003 Crystal Aire Ct
Grain Valley, MO 64029

Dear William Anthony Alexander and Deborah Marie Alexander:

RE:    Loan Number 106-1205511706

Thank you for contacting America's Servicing Company (ASC) regarding your mortgage loan. I
have reviewed your correspondence dated May 04, 2012 and would like to provide you with the
details of my research.

You have indicated concerns regarding the origination of the loan. Our records indicate the Note
was initiated by Taylor Bean & Whitaker Mortgage Corp. As the servicer, ASC is unable to
substantiate certain claims regarding the origination of the loan. Please address these issues with
Taylor Bean & Whitaker Mortgage Corp. as they are the originating lender. ASC denies any
allegations regarding the servicing of the loan.

Please refer to the loan documents that you executed and received a copy of during the closing of
this loan. These documents validate the above mentioned loan

All inquiries and concerns should be addressed with us as the servicer of this loan. The investor for
the loan is Hudson City Savings Bank, and their address is.

        West 80 Century Road
        Paramus, NJ 07652

Although we are providing this information, the investor will more than likely refer you back to us to
answer any questions about the loan or the servicing of the loan .

This communication is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you have received a
discharge of this debt in bankruptcy or are currently in a bankruptcy case, this notice is not intended as an attempt to collect a debt as this company
has a security interest in the property and will only exercise its rights against the property

WC302426



PO Box 10328
Des Moines. IA 50306-0328

Alexander
May 16, 2012
Page 2

Enclosed you will find the following documents. A description of each document is included for
your reference:

¬    Payment History/Customer Account Activity Statement (CAAS)

The CAAS reflects a complete payment history for the period of May 20, 2009, through the present
date. The CAAS reflects when payments were received, how they were applied to the loan, and
any distributions made from it. The CAAS provides a description for each transaction and running
balances of the unpaid principal, escrow, unapplied, and outstanding fee accounts. It also includes
the date fees and charges were assessed, any amounts paid toward these fees, and
waivers/reversals of these fees. Late Fees are reported on the annual mortgage statement. The
Unapplied and Unapplied/Suspense Balance columns reference the funds that may have been
placed into the unapplied account. Payments can be placed into the unapplied account if the funds
received do not represent the full monthly mortgage payment due, or if ASC is not informed of
where the payment is to be applied.

□    Note and Security Instrument

Validate the above mentioned loan. The Note and Security Instrument include, but are not limited
to, information concerning our right to assess fees and costs to the loan, inspect the property, and
purchase lender placed insurance on the customer's behalf.

□    HUD1 - Settlement Sheet

Itemization of all charges imposed for the real estate transaction, including incoming and outgoing
funds. Items indicating POC (Paid Outside of Closing) are fees associated with the transaction but
paid prior to closing.

□    Final Loan Application

Used to record relevant financial information about a mortgage applicant.

¬    Truth in Lending (TIL)

Contains the final amount financed, annual percentage rate, finance charge, total of payments,
payment schedule, and whether the loan includes a demand feature, prepayment penalty,
assumption feature, variable rate feature, late charge feature, and security for the loan.

This communication is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you have received a
discharge of this debt in bankruptcy or are currently in a bankruptcy case, this notice is not intended as an attempt to collect a debt as this company
has a security interest in the property and will only exercise its rights against the property.

WC4U3428



PO Box 10328
Des Moines, IA 50306-0328

Alexander
May 16, 2012
Page 3

Any documents or requested information not provided in this letter are due to the request being too broad to determine specific information needed, or are considered to be proprietary information of ASC and will not be provided at this time without a subpoena. Additional information is available by calling our Subpoena Line at (877) 883-6254.

For a payoff statement or general questions regarding the information provided, please contact our Customer Relations Department at (800) 842-7654. A representative will be able to assist you Monday through Friday between the hours of 8 a.m. and 6 p.m., in your time zone.

If you have any questions about or would like to discuss loan workout arrangements, please contact our Collections Department at (800) 662-3806. A Collections representative will be able to assist you Monday through Friday between the hours of 8 a.m. and 11 p.m., and on Saturday from 9 a.m. to 3 p.m. Eastern Time.

If you have additional questions, please call our Customer Relations Department at (800) 842-7654. A representative will be able to assist you Monday through Friday between the hours of 8 a.m. and 6 p.m., in your time zone.

Sincerely,

Kari Calhoun
Written Correspondence

Enclosures

This communication is an attempt to collect a debt and any information obtained will be used for that purpose. However, if you have received a discharge of this debt in bankruptcy or are currently in a bankruptcy case, this notice is not intended as an attempt to collect a debt as this company has a security interest in the property and will only exercise its rights against the property.

WC403/42e



# NOTE

| | | |
|---|---|---|
| **March 25, 2009** | **Grain Valley** | **Missouri** |
| [Date] | [City] | [State] |

**3000 Crystal Aire Court**
**Grain Valley, MO 64029**
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 420,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Taylor, Bean & Whitaker Mortgage Corp.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **5.7500%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **May 01, 2009**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **April 01, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Taylor, Bean & Whitaker Mortgage Corp, 1417 North Magnolia Ave, Ocala, FL 34475**

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,451.01

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3200 1/01

(Page 1 of 3 pages)

*158407431[3]*

MAY-30-2012 WED 02:16 PM HARVEST GRAPHICS   FAX NO. 3134385545   P. 07

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.0000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3200 1/01

ITEM 1745L9 (0011)     *(Page 2 of 3 pages)*

MAY-30-2012 WED 02:16 PM UNIWEST GRAPHICS     FAX NO. 9136989545     P. 08

this Note, That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower has executed and acknowledges receipt of pages 1 through 3 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
William Anthony Alexander        -Borrower

_____ (Seal)
Deborah Marie Alexander          -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

[Sign Original Only]

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3200 1/01





RECORDER'S CERTIFICATION
JACKSON COUNTY, MISSOURI
03/31/2005 11:11:51 AM
INSTRUMENT TYPE: DT  FEE: $88.00  18 Pages

INSTRUMENT NUMBER/BOOK & PAGE:
2005I0026190

ROBERT T. KELLY, DIRECTOR OF RECORDS

―――――――――― [Space Above This Line For Recording Data] ――――――――――

(1)  Type of Document: DEED OF TRUST
(2)  Date of Document: March 25, 2005
(3)  Grantor/Borrower Names: William Anthony Alexander, Deborah Maria Alexander

(4)  Grantee/Lender Name and Address: Taylor, Bean & Whitaker Mortgage Corp.
     1417 North Magnolia Ave
     Ocala, FL 34475

(5)  Legal description or location of legal description in the document:
     See Attached Exhibit A.   Page 15

After Recording Return To:
ATI TITLE
1500 NW MOCK AVENUE
BLUE SPRINGS         , MO 64014

523495
First American Title
1000 NW Mock Avenue
Blue Springs, MO 64015
816-229-5960

MISSOURI RECORDING COVER SHEET

ITEM 127121.1 (011 1  MPSR

MIN:  XAMD-9B
To Order Call: 1-800-630-5972 □ Fax: 616-768-1131

04/06/2012   5:52PM (GMT-05:00)

# DEED OF TRUST

MIN: 100029590007431197

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **March 25, 2006**, together with all Riders to this document.

(B) "Borrower" is **William Anthony Alexander and Deborah Marie Alexander**

Borrower is the trustor under this Security Instrument.

(C) "Lender" is **Taylor, Bean & Whitaker Mortgage Corp.**
Lender is a **Florida Corporation** organized and existing under the laws of **FL**. Lender's address is
**1417 North Magnolia Ave, Ocala, FL  34475**

(D) "Trustee" is **ATA/TITLE   DAVID DYER**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated **March 25, 2006**. The Note states that Borrower owes Lender **Four Hundred Twenty Thousand and no/100**
Dollars (U.S. $420,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

MISSOURI - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM T2191L1 (0011)—MERS               (Page 1 of 14 pages)

Form 3026 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Case 4:14-cv-00007-BCW     Document 1-2     Filed 01/03/14     Page 81 of 95

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3026 1/01

(Page 2 of 14 pages)                                                                   GREATLAND ■
                                                                                       To Order Call: 1-800-530-9393 □ Fax: 616-791-1131
ITEM T6019L2 (0011)—MERS

Case 4:14-cv-00007-BCW    Document 1-2    Filed 01/03/14    Page 82 of 95

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, bargains, sells, conveys and confirms to Trustee, in trust, with power of sale, the following described property located in the **County** of **Jackson** :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

**See Attached Exhibit A.   Page 15**

which currently has the address of                    **3003 Crystal Aire Court**
                                                      [Street]

**Grain Valley** , Missouri        **64029**        ("Property Address"):
[City]                         [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's

MISSOURI—Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3026 1/01
                                                                          GREATLAND ■
ITEM TOP-0.6 (01111—MERS)                    (Page 3 of 14 pages)        To Order Call: 1-800-630-6303 □ Fax 646-491-1931

check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                              Form 3026 1/01

ITEM 7007(12) 2011) - MERS                                  *(Page 4 of 14 pages)*                              (800)-630-9393 □ Fax 616-791-1131

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

NEW TR190LE (2111)—MERID

(Page 5 of 16 pages)

Form 3026 1/01

GREAT AND ®
To Order Call 1-800-530-9385 ☐ Fax 615-781-1131

Case 4:14-cv-00007-BCW   Document 1-2   Filed 01/03/14   Page 85 of 95

coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                         Form 3026 1/01

ITEM T9610L7 (0011)—MERS                          (Page 6 of 16 pages)            To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

    8.   **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

    9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

    10.   **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                 **Form 3026 1/01**
GREATLAND ■
(Page 7 of 14 pages)

Mortgage Insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or

Form 3036 1/01
GREAT, AND IL
To Order Call: 1-800-530-9393 □ Fax: 516-791-1131

not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14.  **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15.  **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM T2718L11 (0111)—MERS

*(Page 9 of 14 pages)*

Form 3026 1/01
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 516-791-1131

otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3026 1/01

ITEM 2709L10 (0011)—MERS      (Page 10 of 14 pages)

Case 4:14-cv-00007-BCW    Document 1-2    Filed 01/03/14    Page 90 of 95

19.  Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the

MISSOURI  Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

TSM-TWME,R (0110—MFRO)          (Page 11 of 14 pages)          Form 3026 1/01

F. 21    FAX NO. 3134385545    MAY-30 2012 WED 05:24 PM HARVEST GRAPHICS

Case 4:14-cv-00007-BCW   Document 1-2   Filed 01/03/14   Page 91 of 95

action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall mail copies of a notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property to any later time on the same date by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Lease of the Property. Trustee hereby leases the Property to Borrower until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Borrower, and every person claiming an interest in or possessing the Property or any part thereof, shall pay rent during the term of the lease in the amount of one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.

26. Homestead Exemption. Borrower hereby waives all homestead exemptions in the Property to which Borrower would otherwise be entitled under Applicable Law.

27. Notice. Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

MISSOURI—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

FORM 17 (0010)—06/09                          (Page 12 of 14 pages)

Form 3026 1/01
(www) WG 8
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

P. 22          FAX NO. 8154038545          MAY-30-2012 WED 05:25 PM HARVEST SAVINGS

Case 4:14-cv-00007-BCW   Document 1-2   Filed 01/03/14   Page 92 of 95

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 14 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
William Anthony Alexander          -Borrower

_____ (Seal)
Deborah Marie Alexander          -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                              -Borrower

Witness:                              Witness:

_____          _____

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3026 1/01

ITEM T0719L14 (0111)          (Page 13 of 14 pages)          GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

04/06/2012   5:52PM (GMT-05:00)

State of M.O.

County (and/or city) of Jackson

On this 25 day of March, 2005 , before me personally appeared William Anthony Alexander and Deborah Marie Alexander husband and wife to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

_____
Notary Public

JEN BROWN
Notary Public-Notary Seal
STATE OF MISSOURI
Jackson County
My Comm. Expires: OCT. 21, 2007

MISSOURI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3046 1/01
(Page 14 of 14 pages)

04/06/2012  5:52PM (GMT-05:00)

# EXHIBIT 'A'

**LOT 20, CRYSTAL AIRE 3RD PLAT, A SUBDIVISION IN JACKSON COUNTY, MISSOURI, ACCORDING TO THE RECORDED PLAT THEREOF.**
**A.P.N,**

Initials: _____    _____.___            Page 1 of 1  15